UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RUBY CONDE, as the Administratrix ad Prosequendum, of the Estate of Derreck Denzel Mack, deceased, and Individually as the Surviving Mother and Heir at Law of Decedent, | : : : : : : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : : | Civil No. 14-7531 |
| v. | : : | |
| City of Atlantic City, John Doe Officer #1 and John and Jane Does #2-10, | : : : | Opinion |
| Defendants. | : : | |

This matter comes before the Court on Motions of the City of Atlantic City [Dkt. No. 54] and Defendants John Smith and Michael Ruzzo [Dkt. No. 53] seeking summary judgment, pursuant to Fed. R. Civ. P. 56. The Court has considered the written submissions of the parties, as well as the arguments advanced at the hearing on May 22, 2017. For the reasons stated on the record that day, as well as those that follow, the City of Atlantic City's motion is granted and John Smith's and Michael Ruzzo's motion is granted.

## I.    Background

Plaintiff Ruby Conde brings this action individually and on behalf of the Estate of, her son, Derrek Denzel Mack ("Mack"). Mack was shot and killed by Defendant Atlantic City Police Officer John Smith on December 17, 2012. According to the

1

Complaint, law enforcement officers responded to the area of Baltic Avenue and Martin Luther King Boulevard, in Atlantic City, New Jersey, in response to information that two individuals, with a concealed weapons, were observed in the area. <u>See</u> Smith Stat., Def. Ex.2; Am. Compl., ¶ 16.   Upon the arrival of Officer Tweedle, Mack ran. Am. Compl. at ¶ 18.   Mack, alleged as unarmed, ran for approximately one block when Smith, who had arrived on the scene and began to pursue Mack on foot, drew his weapon. <u>Id.</u> at ¶¶ 18, 24.   According to Plaintiff, Mack stopped running and signaled surrender by raising his arms in the air. <u>Id.</u> at ¶ 21. Defendant Smith fired his weapon three times striking Mack twice in the back; a third shot missed Mack and struck a nearby vehicle. <u>Id.</u> at ¶¶ 22, 23.

As a result of the two bullet wounds, Mack collapsed on the sidewalk and remained in a prone position.   There is video evidence of the scene, taken by a bystander's cell phone, after Mack was shot. Defendant Atlantic City Police Officer Michael Ruzzo and other back up officers arrived on the scene of the shooting. <u>See</u> *iPhone* video, Ex. 7; Am. Compl. at ¶ 26.   As will be discussed infra, video evidence demonstrates that for approximately five minutes, no one provided medical assistance to Mack, however, records indicate that Ruzzo called an ambulance approximately one minute after Mack was shot. Instead of rendering medical aid to Mack, Ruzzo took Smith to the hospital and left the scene. Am. Compl. at ¶ 30. Despite Ruzzo's departure, several other law enforcement officers can be seen on the video in close proximity to Mack, who was face down on the ground. <u>See</u> *iPhone* video, Ex. 7.   Mack succumbed to the injuries sustained in the shooting, but it is unclear from the record whether Mack was dead on arrival at the Atlantic City Medical Center Emergency Room or he died at

the facility.

As will be discussed in detail, there are some disputed facts related to whether Mack was actually in possession of a gun on the day of the incident. Officer Smith claims that he witnessed Mack holding a firearm during his pursuit of the fleeing Mack. <u>See</u> Smith Stat., Ex.2. In addition, there is testimony from other Atlantic City police officers stating that Mack had a gun and that a gun was recovered from the area where Mack was shot and fell. None of the non-police witnesses testify that they saw Mack with a weapon; the testimony does not confirm the presence of a weapon, but does not exclude the possibility that Mack was armed.

Conde brings several causes of action against the Defendants, pursuant to 42 U.S.C. § 1983, including a deadly force claim against Smith (Count I), a state created danger claim against Ruzzo and Smith (Count II), a denial of medical assistance claim against all of defendants (Count III), a municipal liability claim pursuant to <u>Monell v. Dep't of Soc. Serv. of City of New York</u>, 436 U.S. 658, 691-94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) against Atlantic City (Count IV), a claim of battery against Smith (Count V), a wrongful death claim against all defendants (Count VI) and a Survivorship Action against all defendants (Count VII).

During oral argument, Plaintiff conceded that she is not pursuing claims against Atlantic City on a theory of failure to train. The thrust of Plaintiff's case against Atlantic City rests on a failure to timely render medical assistance. The Court will address the claims against each defendant.

## II. Summary Judgment Standard

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)); <u>accord</u> Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. <u>Id.</u> In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that

there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the finder of fact. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

A. **Plaintiff's Constitutional Claims Against the City of Atlantic City**

Counts II and IV allege a violations of Mack's constitutional rights against the City of Atlantic City pursuant to section 1983. Section 1983 does not provide any substantive rights, but is instead a vehicle for the enforcement of rights. In Monell, 436 U.S. at 691-94, the Supreme Court stated that a municipality could not be held liable under Section 1983 pursuant to a theory of respondeat superior. Municipalities are only held responsible "for their own illegal acts." Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)). As a result, Plaintiff's Claims in Counts II and IV as against Atlantic City, require a showing of

liability against the other two named individual defendant police officers, Ruzzo and Smith.

B. **Claims Under 42 U.S.C. § 1983 and Qualified Immunity**

Plaintiff's constitutional claims are governed by Title 42 U.S.C. § 1983, which provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution. See Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992). Any analysis of 42 U.S.C. § 1983 should begin with the language of the statute:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. As the above language makes clear, Section 1983 is a remedial statute designed to redress deprivations of rights secured by the Constitution and its subordinate federal laws. See Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979). By its own words, therefore, Section 1983 "does not . . . create substantive rights." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Baker, 443 U.S. at 145, n.3).

To state a cognizable claim under Section 1983, a plaintiff must allege a "deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996)). Thus, a plaintiff must demonstrate two essential elements to maintain a claim

under § 1983: (1) that the plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that the plaintiff was deprived of his rights by a person acting under the color of state law.  Williams v. Borough of West Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989).

The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Thus, government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" and it "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  Id.  (internal quotation omitted).  Properly applied, qualified immunity "protects 'all but the plainly

incompetent or those who knowingly violate the law.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Couden v. Duffy, 446 F.3d 483, 492 (2006).  "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity.  Couden, 446 F.3d at 492 (internal citations omitted).  Further, "[i]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized."  Malley, 475 U.S. at 341 (1986).  See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (The general touchstone is whether the conduct of the official was reasonable at the time it occurred.)  Finally, because qualified immunity is an affirmative defense, the burden of proving its applicability rests with the defendant. See Beers-Capital v. Whetzel, 256 F.3d 120, 142, n.15 (3d Cir. 2001).

Here, Plaintiff alleges a violation of Mack's Fourth, Fourteenth, and Eighth Amendment rights and there is no dispute that the individual police officers were acting under the color of state law.

## III. Analysis

Summary judgment is granted in favor of Officer Smith because he is entitled to

qualified immunity for his reasonable belief that Mack was armed and posed a threat during Smith's on foot pursuit of Mack.   Summary judgement is granted in favor of Officer Ruzzo because there is no genuine issue of material fact related to the claim that he was indifferent to the medical needs of Mack.   Summary judgment is also granted on the claims of state created danger, wrongful death, survivorship, and all claims against the City of Atlantic City.

A.   <u>Counts I (Excessive Force) and V (Battery)</u>

Summary judgment is granted as to Count I, which alleges excessive force against Smith in violation of the Fourth Amendment.   "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." <u>Tennessee v. Garner</u>, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).   A claim for excessive force claim is reviewed under an objective reasonableness standard. <u>Graham v. Connor</u>, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).   Under this standard, the Court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Id.</u> at 396, 109 S.Ct. at 1872; <u>see also</u> <u>Groman</u>, 47 F.3d at 634. "The calculus of reasonableness must embody allowance for the fact that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " <u>Id.</u> at 396–97, 109 S. Ct. at 1871–73; <u>see also</u> <u>Sharrar v. Felsing</u>, 128 F.3d 810, 820–21 (3d Cir. 1997).

"Whether or not [an officer's] actions constituted application of 'deadly force,' all that matters is whether [the officer's] actions were reasonable." <u>Scott v. Harris</u>, 550 U.S. 372, 383 (2007). While mistakes will invariably happen, the Fourth Amendment guarantees that mistakes will only be made after proper diligence and regard for our notions of liberty and justice is accorded. "Under qualified immunity, police officers are entitled to a certain amount of deference for decisions they make in the field [because they] must make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." <u>Gilles v. Davis</u>, 427 F.3d 197, 207 (3d Cir. 2005) (internal quotations omitted)). "[S]ufficient probability, not certainty, is the touchstone of the Fourth Amendment[.]" <u>Hill v. California</u>, 401 U.S. 797, 803-04 (1971). Thus, the reasonableness of a seizure is assessed in light of the totality of the circumstances. <u>Abraham v. Raso</u>, 183 F.3d 279, 289 (3d Cir. 1999).

Under this standard and viewing the facts in a light most favorable to the Plaintiff, the Court finds that although there are some questions of fact related to whether Mack was actually in possession of a gun, Smith's belief that Mack was armed was objectively reasonable and Smith enjoys qualified immunity.

On December 17, 2012, the Stanley Holmes Village section of Atlantic City was under surveillance by several members of various law enforcement agencies, including members of the Atlantic City Department. <u>See</u> Exs. B, C. Because the Village is a known area of frequent drug activity, it had been under physical and video surveillance for many months prior to Mack's death.[1] For this reason, and because he had prior

---

[1] Given the scope and duration of surveillance, the record includes video surveillance tapes which

interaction with the Atlantic City police, Mack and his brother Michael Mack, were known to law enforcement officers.2  Ex. B, p. 26.

On the day in question, Derreck Mack was walking with Terry Davis through the Village in the area of Baltic Avenue and Martin Luther King Boulevard.   Det. James Barrett was conducting surveillance in the Village and identified two males, one of which he believed to be a Mack brother and another individual named Terry Davis. <u>See</u> Ruzzo Statement, Ex. 1, p. 2.   Barrett radioed Atlantic City Police Detectives Dabney, Defendant Ruzzo, and Fair to alert them that both men were armed and described an individual as wearing a black and white hat as well as a black and white Oakland Raiders jacket.   <u>See</u> Ex. B., p. 26; Ex. C.   The police descended upon the area and began to chase Davis and Mack across Baltic Avenue toward the Stanley Holmes Village. <u>See</u> Security Camera 31 footage, Ex. 2.   Detective Dabney apprehended Terry Davis without incident and recovered a handgun from Davis' person.   <u>See</u> Dabney Rpt.,   Ex. 4.

Defendants claim that the video depicts Mack as possessing a handgun in his

---

depict various individuals, possibly including Mack, on December 17, 2012.  Exs. B, C.  There is notable confusion as to the date stamp on the video: the date stamp indicates a date of November 30, 2012, however, Assistant U.S. Attorney Elizabeth Pascal has represented that this video, which allegedly depicts Mack, is dated December 17, 2012 and was introduced as admissible evidence during the Dirty Blok Trials.   <u>See</u> Ex. D. The Court has reviewed the video and finds it grainy and difficult to positively identify any of the individuals with certainty and/or identify any objects that may or may not be in the possession of the depicted person. However, still shots of the video produced in Defendants' Exhibit "C" which more clearly depict Mack with a gun in his waist band.   This evidence suffers from the mislabeled date stamp on the top of the frame; however, the Assistant United States Attorney's statement alleges that the photo was taken on December 17, 2012.
    According to Plaintiff, no surveillance video or photographs of Derreck Mack taken on December 17, 2012 by any law enforcement officials has been produced.   The date stamp of the FBI surveillance video is November 30, 2012. As a result, and despite the letter by the United States Attorney's Office, Plaintiff claims there is no proof that Mack was armed on December 17, 2012.

2 Det. Dabney arrested Derreck Mack in May of 2011; a handgun was recovered from both Mack and his brother, Michael.   Ex. B., p. 26.

waistband and that he ran while being pursued by Officer Smith. <u>See</u> Ex. A., at ¶ 19; Ex. B.   Officer Smith claims that when Mack reached into his waistband, Officer Smith observed a handgun. <u>See</u> Smith Dep., Ex. E.   Although Officer Smith ordered Mack to drop the gun, Mack continued to flee, but his pace eventually slowed.   <u>Id.</u>   Smith claims that Mack began to turn toward him in a manner suggesting that Mack was taking a stance. <u>Id.</u>   Smith discharged his gun, sending Mack to the ground.

   In addition to the police officers, there were several eye-witnesses to the shooting.   There is no video evidence of the shooting.3

   Eyewitness Denyse Ridley had a visual on the chase but could not hear whether Smith gave any commands to Mack during the pursuit. <u>See</u> Ridley Dep., Ex. 6, pp. 7-8. From her vantage point, she describes Mack as running toward her with Smith in pursuit. <u>Id.</u>   She saw Mack's left hand raise in the air and turn his body toward Smith "like he was coming around." <u>Id.</u> at p. 2. Ridley further describes the series of events that lead her to conclude Mack had gun:

> Q. "But from your vantage point, you saw the left hand up, right hand was still tucked in front of his body, somewhere in the stomach or waist area?"
>
> Ridley: "Right. Like his, yeah, like coming towards, like coming from his stomach, like if you have a cramp and you pull your hand aways from your stomach, that's how his hand came up.   It didn't come straight up like this, this one came up.   This one didn't."

   The fact that Mack did not completely stop and because he "swerved" with only one hand raised gave Ridley concern that Mack did not intend to surrender. <u>Id.</u> at 9.

---

3 Plaintiff claims that the lack of video evidence of the shooting in an area under constant surveillance is suspect.

Ridley states:

> But I saw the young man put his left arm up but slowly come up with his right arm but in like a slant, his body slanted, not fully straight back to the officer. So I don't know if the officer assumed that he was pulling something from his front to come up with, come around or whatever, but the officer started shooting[] . . . I would've shot him because I don't know if he is pulling something from his waistband or he was coming to give up."

Id. at 9, 11. Ridley explained that the reason for her concern was the fact that both hands did not come straight up in the air in a surrender posture. Rather, the left came up first and then the right began to rise as Mack appeared to turn toward the officer. Id.

Plaintiff claims that the record also reflects testimony of other witnesses who state that Mack was "unarmed." This mischaracterizes the testimony of these witnesses. Witness Darlene Newell- Clements states that she "heard the officer when he said halt, stop, he told him. And the guy stopped, he put his hands up and the cop shot him in the back." Newell-Clements Dep., Ex. 4, 41:1-5. Newell-Clements "can't say" that Mack had a gun or that she saw a gun because Mack was "in line with the mailbox" when she witnessed the shooting, obscuring her view. Id. at 55:20-22; 49:11-14.

> Q. Did the guy that was running have anything in his hands?
> A. I can't say that.
> Q. Do you know if he had reached in his waistband or any other area before he put his hands up?
> A. Again, I can't say that because I was at a little distance.

Id. at 50:17-24.

Witness Kaleef Shabazz gave a statement to the Atlantic County Prosecutor's Officer and detailed his eyewitness account to Smith's pursuit of Mack. According to

Shabazz, he saw Mack's hands in the air when Smith shot him.    See Shabazz Stat., Ex. 3. Shabazz acknowledged that his view of the incident was obstructed by a bush and that he could only see Mack from the shoulders up.    Id. There is no evidence that Shabazz knew Mack to be unarmed; only the absence of an allegation that Shabazz saw a gun. And Shabazz is unable to determine if Mack's hand went to his waistband before it was raised. Id.

The record indicates that several police officers either observed Mack with a handgun prior to the shooting or saw a handgun on the ground next to Mack after he was shot and fell.    Detective Kevin Fair was part of the pursuit of Mack.    He states that when he first observed Mack, he did not see a gun. Fair Dep., Ex. 5, p. 6.   Mack was running and then tripped in the street. Id.   Once Mack got up, Fair saw a silver handgun and alerted police by way of radio and verbal shout. Id.   Fair testifies that he yelled to Smith that Mack was armed when Smith joined the pursuit and was within a closer proximity to Mack than Fair. Id. at 8.   After Mack was shot, Fair states that "there was a handgun that was on the ground, a large silver handgun that was on the ground next to Mack[.]" Id. at 9.

Officer Sparks was also part of the pursuit of Mack and observed a silver handgun on Mack's person. See Sparks' Rpt., Ex. 4.   Sparks further states that both Mack and Davis failed to abide by officers' commands to stop. Id. Detective Lieutenant Sarkos arrived on the scene to find Mack on the ground, handcuffed, and with a handgun just nearby. See Sarkos' Rpt., Ex. 4. When Detective Barrett arrived at the scene of the shooting, he observed Mack in handcuffs with a gun nearby. See Barrett Rpt., Ex. 4.

The non-law enforcement eyewitness accounts support the notion that Smith's conclusion that Mack was armed was reasonable. Not only did Smith observe Mack with a gun, but his recitation of the facts is consistent with that of Ridley and Fair. Importantly, the testimony of Shabazz and Newell-Clements does nothing to undermine Smith's reasonable belief that Mack was either armed or reaching for something in his waistband.4

Plaintiff claims that the fact that the gun was removed from the scene without being photographed creates a genuine issue of material fact related to whether Mack was armed. See Atl. Cnty. Prosecutor's Office Inv. Rep., Atlantic City/000246-253, Ex. 8. At the scene of the shooting, Sgt. String states that observed Officer Tweedle "straddling over a large silver handgun[.]" See String Rpt., Ex. 4. String removed the gun from the scene because the crowd was growing and he feared for the "officer['] s safety." Id. The *iPhone* video confirms that a crowd was growing and becoming loud. Understandably, there was tension as gatherers tried to approach the injured Mack and questioned the police as law enforcement officers attempted to secure the scene, which by all accounts was becoming hostile.

String placed the gun in his vehicle and, once the scene was secured, he personally took it to the forensic unit. Id. As a result of removing the gun from the scene, the gun is not listed in the Prosecutor's Investigation Report as evidence recovered or

_____

4 Plaintiffs' claim that none of the eight individuals interviewed by the Atlantic County Prosecutor's Office on the day of the shooting mentioned seeing a gun possessed by Derreck Mack either before or after the shooting does not undermine the Court's determination that Smith's belief was reasonable. See Atlantic City/000714-721, Ex. 6. While none of the witnesses state that they observed a gun, none testified that Mack was unarmed or that Mack was not in possession of a gun.

identified at the scene and there are no photographs of the gun near the area where Mack fell after being shot. See Atl. Cnty. Prosecutor's Office Inv. Rep., Atlantic City/000246-253, Ex. 8.   In addition, there is no DNA evidence linking Mack to the gun that was retrieved; however, DNA taken from the alleged gun samples cannot exclude Mack as a partial contributor to the mixed DNA profile obtained from the gun.[5] See Forensics Rep., Ex. N.

The Court agrees that there may be a genuine issue of fact related to whether Mack was actually armed on the day in question.   However, the test is not whether Mack was armed; qualified immunity affords police officers deference for split-second decisions in rapidly evolving circumstances. Gilles, 427 F.3d at 207.   The Fourth Amendment demands Smith act reasonably and with a "sufficient probability, not certainty[.]" Hill, 401 U.S. at 803-04. "It is unreasonable for an officer to use deadly force against a suspect unless the officer has good reason to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Lamont v. New Jersey, 637 F.3d 177, 183 (3d Cir. 2011) (quotation omitted).   Therefore, as long as Smith's belief that Mack was armed is reasonable, qualified immunity applies even if Smith was mistaken. Pearson, 555 U.S. at 236.

Proceeding with the qualified immunity analysis regarding Officer Smith's use of deadly force, the Court finds that Mack's right to be free from excessive, deadly force was clearly established on the night of the shooting. "It has long been the law that an

---

5 Plaintiffs' expert opines that the DNA analysis cannot exclude or include approximately 50% of the African American, Caucasian or Hispanic populations.   See DNA Report of Arthur Young, Ex. 15.

officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others." <u>Lamont</u>, 637 F.3d at 185; <u>see also</u> <u>Weinmann</u>, 787 F.3d at 450 ("<u>Graham</u> and <u>Garner</u> stand for the proposition that a person has a constitutional right not to be shot unless an officer reasonably believes that he poses a threat to the officer or someone else.") In this case, the issue is whether Smith's use of deadly force was objectively reasonable, given the totality of the circumstances. The Court finds that Smith's belief that Mack was armed and that Mack poses a threat and the use of deadly force was necessary was objectively reasonable under the circumstances.   Although not determinative and with each action applying different standards of review, three different investigations support this conclusion. The Altlantic City Police Department conducted an internal review and took no action against the officers.   The Atlantic County Prosecutor's Office brought the case before a Grand Jury that found the conduct was "lawful and justified" and issued a no bill.   An independent expert also reviewed the case and concluded that Officer Smith operated within the bounds of policy and protocol and his actions were justified. <u>See</u> Report of Emanuel Kapolsohn, Ex. 12In addition, the expert claims that Officer Smith's version of events are consistent with the autopsy findings in relation to the bullet entry wounds and Mack's slightly turned position. <u>See</u> <u>id.</u>, p. 8; Postmortem Examination Photographs, Ex. 5.

The Court, "[i]n qualified immunity cases, [must] adopt[] ... the plaintiff's version of the facts." <u>Scott v. Harris</u>, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Once the Court has "determined the relevant set of facts and drawn all inferences in

favor of the nonmoving party to the extent supportable by the record," the reasonableness of a police officer's actions "is a pure question of law." Id., 550 U.S. at 381, n. 8. To determine whether Smith's use of force was reasonable, the Court applies the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.  Here, Smith was informed by other officers at the scene that Mack was armed, an observation Smith alleges he also made personally. Even assuming all of the officers and Ms. Ridley were lying about the presence of the gun and the video evidence is perhaps unreliable, Smith arrives on the scene with information that the man he is pursuing is armed.  Mack, despite demands to stop, continues to flee and evade arrest and, according to several witnesses, slows his pace as he raises his hands.  Of the witnesses who could see both of Mack's hands raise in the air and Mack's torso, the undisputed evidence shows that, at the very least, the possibility existed for Mack to reach into his waistband, where Smith and others state he holstered the weapon. The bullet wounds are consistent with Smith's account that Mack was turning toward him. See Report of Emanuel Kapolsohn, Ex. 12.

On summary judgment, if "a reasonable officer could have believed that his conduct was justified," the police officer is entitled to qualified immunity. San Francisco v. Sheehan, ––– U.S. ––––, ––––, 135 S.Ct. 1765, 1777, 191 L.Ed.2d 856 (2015). The Court finds that Officer Smith's use of deadly force was objectively reasonable under the totality of the circumstances.

B. Counts II (State Created Danger) and III (Denial of Medical Assistance)

The essence of Plaintiff's constitutional claims in Counts II and III is that the

police officers unlawfully delayed medical care to Mack by failing to call emergency medical services, failing to timely and properly transport Mack to the hospital, and filing to administer care as Mack lay on the ground.    Government officials are required to provide an arrestee, in their custody, medical care for injuries.    The Eighth Amendment's "deliberate indifference" standard, applies, through the Fourteenth Amendment, to Plaintiff's claim that Mack was denied medical attention after he was shot twice in the back by Smith. See, e.g., City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983) (noting that "the due process rights of a person [who was injured while being apprehended by the police] are at least as great as the Eighth Amendment protections available to a convicted prisoner"); Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L.Ed.2d 251 (1976). "[D]eliberate indifference to serious medical needs of prisoners [and arrestees] constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle, supra, 429 U.S. at 104, 97 S. Ct. at 291, 50 L. Ed. 2d at 260 (citations omitted) (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S. Ct. 2909, 2925, 49 L.Ed.2d 859, 875 (1976)).

To succeed under the "deliberate indifference" standard, the plaintiff must prove: (1) that his medical needs were "objectively serious" and (2) that the defendants exhibited "deliberate indifference" to Plaintiff's medical needs. Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir.1987) (citing Estelle, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a

lay person would easily recognize the necessity for a doctor's attention" or "where the denial of treatment would result in the unnecessary and wanton infliction of pain or a life-long handicap or permanent loss." Atkinson v. Taylor, 316 F.3d 257, 272–73 (3d Cir. 2003) (internal citations omitted).

There is no video depiction of Smith's interaction with Mack, but the audio reflects that at 2:04 p.m., someone yelled "Shots fired, one man down."  Ex. B., p. 3. Approximately one minute later a call of "56" was made by Ruzzo; "56" is a code to call an ambulance. Id.; see also Ex. I. Then, Ruzzo escorted Smith to the hospital in a police vehicle.6  Plaintiff alleges that Ruzzo's decision to leave the scene of the shooting and abandon Mack in favor of escorting Smith to the hospital demonstrates deliberate indifference. Plaintiff contends that Ruzzo should have placed Mack in the vehicle and taken him to the hospital because he had been, shot unlike Smith who did not present with any life threatening injuries. Ruzzo states in deposition that the reason he did not attend to Mack is because he believed that Mack was already dead. See Ruzzo Dep., Ex. I, p. 7.

Video taken by a bystander on an iPhone depicts several unnamed persons, believed to be Atlantic City police officers or members of the Atlantic County Prosecutor's Office, standing in close proximity to Mack following the shooting.   The video begins after the shooting has happened and Mack is already on the ground, lying still.   None of the persons in the video touch Mack for several minutes, although it

6 Ruzzo's removal of Smith from the scene is consistent with the Atlantic City Police Department Use of Force Policy.   That Policy states that in the event of serious injury or death as a result of the use of force, the employee shall be removed from the scene as soon as practicable. Ex. O.

appears they are aware of him. The ambulance log indicates that an ambulance was dispatched at 2:06 p.m. and arrived at Mack's position at 2:10 p.m. <u>See</u> Ex. F. Then after five minutes an officer begins CPR. The video also depicts, through commentary and sound, that someone claiming to be a nurse asked to assist Mack but was denied access to the scene. <u>See</u> *iPhone* Video, Ex. 7. Plaintiff identifies the failure to let a medical professional access Mack as indicative of deliberate indifference.

There is some discrepancy as to Mack's arrival time at the hospital; ambulance records indicate an arrival time of 2:18 while the hospital records reflect an arrival time of 2:20 p.m. <u>See</u> Exs. F., G. Giving Plaintiff the benefit of every inference, an ambulance was summoned immediately following the shooting and Mack was on his way to a hospital in an ambulance within seven minutes of being shot. During that time, he was given CPR and several officers testified that he was breathing while he was on the ground. Officer Halvorson reports that upon arriving that the scene, he rolled Mack onto his back. <u>See</u> Halvorson Rpt., Ex. 4. Mack was breathing until he was fully on his back. <u>Id.</u> Officer Spark's states that Mack began to lose consciousness so he removed the handcuffs. <u>See</u> Sparks' Rpt., Ex. 4. Then, Sarkos took Mack's pulse and started performing CPR. <u>See</u> Sarkos Rpt., Ex. 4.

There is no evidence that Mack's chance of survival would have improved had Ruzzo taken him to the hospital instead of Smith or that such a protocol was appropriate. Likewise, there is no evidence that any of the officers in the vicinity of Mack could have done anything to improve his chance of survival. The record is likewise devoid of medical testimony related to actions that could have potentially saved Mack's

life at any point during the nearly seven minutes between his shooting and the arrival of medical professionals.

To the extent that the person on video claiming to be a nurse was in fact medically trained, there is nothing in the record to suggest that the nurse could have performed any intervention to curtail Mack's condition from worsening. Finally, when Ruzzo left the scene, the video evidence depicts a number of other police officers who could have rendered aid to Mack during the seven minutes it took the ambulance to arrive on the scene.   As a result, the facts of this case do not arise to the level of deliberate indifference on the part of Officer Ruzzo.   Summary judgment is granted in favor of Defendant Ruzzo as to Count III.

Summary judgment is granted as to Count II, state created danger.   As to the state-created danger theory, <u>Graham v. Connor</u> appears to foreclose such a claim. 490 U.S. 386, 388 (1989) ("This case requires us to decide what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person. We hold that such claims are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard.") Accord <u>Abraham</u>, 183 F.3d at 288 ("excessive force in the course of an arrest is properly analyzed under the Fourth Amendment, not under substantive due process") (citing Graham, 490 U.S. at 393-94); <u>see also</u> <u>Wilson v. Borough of Bellmawr</u>, No. CV 13-5437, 2016 WL 7377114, at *12 (D.N.J. Dec. 20, 2016).

To the extent that such a claim is properly analyzed under the Fourteenth

Amendment under the facts of this case, the Due Process Clause does not impose an affirmative obligation on the state to protect its citizens. Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d. Cir. 2008). In this regard, the state-created danger theory of liability operates as an exception to that general rule and requires plaintiffs to meet a four part test: "(1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts …; and (4) the state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." Sanford v. Stiles, 456 F.3d 298, 304 (3d Cir. 2006).

As noted above, there is nothing in the record to suggest that any of the Defendants in this case acted in a manner that shocks the conscience with respect to Mack's medical treatment. The state created danger theory rests on the denial of medical care. Because there is nothing in the record to support a claim of actions that shock the conscience, and summary judgment has been granted on the excessive force claim, summary judgment is granted on the state created danger theory.

    C.   Claims Against The City of Atlantic City, (Count IV), Wrongful Death (Count VI) and Survivorship (Count VII).

Plaintiff's Claims in Counts II and IV as against Atlantic City are predicated upon a showing of liability against Ruzzo and Smith. Connick, 131 S.Ct. at 1359. As a result, summary judgment is granted as to these claims because there is no underlying

constitutional violation by either Smith or Ruzzo.  For the same reasons, summary judgment is granted as to Plaintiff's Wrongful Death and Survivorship Action as plead in Counts VI and VII.

IV. Conclusion

For the reasons stated herein, summary judgment is granted in favor of Defendants Ruzzo, Smith and The City of Atlantic City as to all counts.  An appropriate Order shall issue.

Dated: December 5, 2017

                              s/ Joseph H. Rodriguez
                              Hon. Joseph H. Rodriguez,
                              UNITED STATES DISTRICT JUDGE